No. 25-1402

IN THE

# United States Court of Appeals for the Fourth Circuit

ANTHONY D. WRIGHT
Plaintiff - Appellant

v.

G. RUSSELL ROLLYSON, Deputy Commissioner of Delinquent and
Non-entered Lands, in his official capacity only; 21 WVC, LLC, f/k/a
WV County Tax Cert Purchases 2021, LLC
Defendants - Appellees

On Appeal From The United States District Court For The Southern
District Of West Virginia – No. 2:24-cv-000474

**BRIEF OF AMICUS CURIAE NATIONAL CONSUMER LAW
CENTER IN SUPPORT OF PLAINTIFF-APPELLANT'S
POSITION SEEKING REVERSAL**

Jennifer S. Wagner
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square
Boston, MA 02110
(617) 542-8010
jwagner@nclc.org

Dated: July 25, 2025

# CORPORATE DISCLOSURE STATEMENT

No. 25-1402, *Wright v. Hunt, et al.,*

Pursuant to Rule 29(c)(1) of the Federal Rules of Appellate Procedure and Fourth Circuit Local Rule 26.1 *Amicus Curiae* the National Consumer Law Center makes the following disclosure:

1) For non-governmental corporate parties please list all parent corporations. **NONE.**

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock. **NONE.**

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests. **NONE.**

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant. **NOT APPLICABLE.**

/s/ Jennifer S. Wagner
Jennifer S. Wagner

Dated: July 25, 2025

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ..................................................... iii

STATEMENT OF CONSENT .................................................... v

STATEMENT OF INTEREST OF AMICUS CURIAE............................ 1

SUMMARY OF ARGUMENT.................................................. 3

ARGUMENT.................................................................. 5

    A.    Understanding Tax Foreclosure Processes ............................ 5

    B.    West Virginia's Current Tax Foreclosure Process that Does Not Compensate the Former Owner for Surplus Equity in Excess of the Tax Debt Owed Violates the Takings Clause of the Fifth Amendment and is Unconstitutional. ................................................. 10

        1.    The Takings Clause Protects Surplus Equity after a Tax Foreclosure ............................... 10

        2.    Surplus Equity Must Be Based on Fair Market Value of the Property at the Time of the Taking........ 13

        3.    West Virginia's Narrowly Defined Concept of "Surplus" is Constitutionally Deficient ...................... 16

CONCLUSION ............................................................... 19

CERTIFICATION OF BAR MEMBERSHIP ......................................... 21

CERTIFICATE OF COMPLIANCE ............................................ 21

CERTIFICATE OF SERVICE ................................................ 22

# TABLE OF AUTHORITIES

## Cases

*Berkeley Cty. Council v. Gov't Prop. Income Trust LLC,*
880 S.E.2d 487 (W. Va. 2022) ...................................................... 15

*Brown v. Legal Foundation of Washington,*
538 U.S. 216 (2003) ..................................................................... 12

*Cedar Point Nursery v. Hassid,*
594 U.S. 139 (2021) ..................................................................... 12

*Grady v. Wood Cty. W.V.,*
-- F.Supp., 2025 WL 1234111 (S.D.W.V. Apr. 29, 2025) ..... 10, 13

*In re Upstream Addicks and Barker (Texas) Flood-Control*
*Reservoirs,* 162 Fed. Cl. 495 (2022) ...................................... 12, 13

*Kimball Laundry Co. v. U.S.,*
338 U.S. 1 (1949) .......................................................................... 12

*Knick v. Township of Scott,*
588 U.S. 180 (2019) ..................................................................... 11

*Sinclair v. Cty. of Oakland,*
2025 WL 1489543 (E.D. Mich. May 23, 2025) .......................... 13

*Tyler v. Hennepin Cnty.,*
598 U.S. 631 (2023) ........................................................... *passim*

*Wright v. Banks,*
753 S.E.2d 100 (W. Va. 2013) ..................................................... 14

**Constitutional Provisions**

Fifth Amendment ........................................................... *passim*

Eighth Amendment ............................................................ 1, 3

Fourteenth Amendment ......................................................... 11

**Statutes**

Alaska Stat. §§ 29-45-390, 29-45-450 ..................................... 6

Ark. Code Ann. §§ 26-37-201, 26-37-202 ................................ 5

Colo. Rev. Stat. §§ 39-11-115, 39-11-117, 39-11.5 ............... 6

Fla. Stat. §§ 197.432, 197.502 ............................................. 6

Ga. Code Ann. § 48-4-1(a)(1) ............................................. 5

Mass. Gen. Laws ch. 60, § 64A ........................................ 18

Mich. Comp. Laws § 211.78m ............................................ 6

Mich. Comp. Laws § 211.78t .............................................. 18

N.C. Gen. Stat. § 105-374 ................................................... 5

N.J. Stat. Ann. § 54:5-46 .................................................... 6

S.D. Codified Laws § 10-25-39.2, § 10-25-39 ..................... 18

W. Va. Code Ann. §§ 11A-1-2, 11A-2-10, *et seq.* ............. 7, 8, 9

W. Va. Code § 11-3-1 ......................................................... 14

W. Va. Code § 11A-3-65 ................................................ 16, 17

**Other Authorities**

John Rao, *The Other Foreclosure Crisis: Property Tax Lien Sales*, Nat'l Consumer Law Ctr 5, 8-10 (Jul. 2012), available at *http://bit.ly/1MLTZMc* ............................................................. 3

OCC Bulletin 2004-39 (Aug. 31, 2004) .................................................. 6

## STATEMENT OF CONSENT

This brief is being filed with a Motion for Leave to File. Plaintiff-Appellant, Anthony Wright, has consented to the filing of this *amicus* brief.  Appellee, 21 WVC, LLC has indicated that it will not oppose the filing of this brief.  The Government-Appellee has not consented or declined to consent to the filing of this brief.

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

This case raises the question of whether West Virginia's tax foreclosure system violates the Takings Clause of the Fifth Amendment and the Eighth Amendment's prohibition of excessive fines. West Virginia law allows for the complete forfeiture of real property worth exponentially more than the taxes owed and the transfer of that property to a private party without just compensation. Specifically, in this case, Government-Appellee has violated its constitutional duty to pay just compensation by confiscating and transferring to a third-party Mr. Wright's property worth over $65,000 to collect an original tax debt of $79.89.

In *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 639 (2023), the Supreme Court held that while "[t]he County had the power to sell [property] to recover the unpaid property taxes," "it could not use the toehold of the tax debt to confiscate more property than was due" without running afoul of the Fifth Amendment. Notwithstanding *Tyler*, West Virginia continues

---

[1] Amicus curiae affirms that no party or counsel for any party authored this brief in whole or in part and that no one other than Amicus curiae or its counsel contributed any money that was intended to fund the preparation or submission of this brief.

to employ a tax foreclosure process that enables third parties to acquire fee simple title to property without compensating owners for the surplus equity. Contrary to the district court's determination, West Virginia's statutory scheme does not provide a constitutionally adequate mechanism for former owners to recover this surplus. The result is a government-facilitated windfall conferred upon third parties. Owners suffer losses commensurate with the windfalls in contravention of the Supreme Court's holding in *Tyler* and the Takings Clause of the Fifth Amendment.

The National Consumer Law Center ("NCLC") has a substantial interest in safeguarding elderly and low-income individuals from unfair and deceptive financial practices. NCLC is recognized nationally as an expert in consumer protection issues. NCLC draws on this expertise to provide information, legal research, policy analyses, and market insights to federal and state legislatures, administrative agencies, and the courts. For more than a decade, NCLC has advocated for state and federal policy reforms to prevent homeowners from losing their home equity due to small unpaid property tax bills and has supported legislation that requires fairer tax lien and foreclosure processes. *See, e.g.*, John Rao, *The*

*Other Foreclosure Crisis: Property Tax Lien Sales*, Nat'l Consumer Law Ctr. 5, 8-10 (Jul. 2012), available at *http://bit.ly/1MLTZMc*. NCLC's argument focuses on the Fifth Amendment and West Virginia's constitutionally deficient statutory tax foreclosure scheme. It concurs with Appellant for the reasons stated in Appellant's brief that the district court also erred in dismissing Mr. Wright's claim under the Excessive Fines Clause of the Eighth Amendment. *See Tyler*, 598 U.S. at 648-50 (Gorsuch, J., concurring) (economic penalties to deter noncompliance with the law, such as the failure to pay property taxes, are fines that may not be excessive.)

## SUMMARY OF ARGUMENT

Mr. Wright has plausibly alleged that the government violated the Fifth Amendment by failing to provide just compensation when it transferred absolute title to his property to a third party. At the time of the transfer, the property's value far exceeded the tax debt owed. The Takings Clause of the Fifth Amendment precludes the government from taking private property for public use without providing just compensation. U.S. CONST. AMEND. V. In *Tyler v. Hennepin Cnty.*, 598 U.S. 631 (2023), the Supreme Court made clear that the former owner of

property retains a protected interest in the surplus equity following the seizure of the property to satisfy an outstanding tax debt.

West Virginia's tax foreclosure system combines elements of both tax lien certificate sales and strict foreclosure. If delinquent taxes remain unpaid, the tax lien is sold at public auction. If the property remains unredeemed and certain statutory conditions are satisfied, the purchaser is granted absolute title to the property without any further process to assess or return the former owner's surplus equity. The absence of additional processes prior to transfer of title makes West Virginia fundamentally different from other states using the tax lien certificate model, and it renders the system unconstitutional. Specifically, in this case, all of Mr. Wright's surplus equity—estimated at over $60,000—was taken to satisfy an original tax debt of $79.89. While the government had the power take Mr. Wright's property to recover the unpaid taxes, the Fifth Amendment precluded it from confiscating more than was due without just compensation. *See Tyler*, 598 U.S. at 639.

**ARGUMENT**

## A.     Understanding Tax Foreclosure Processes

All states have laws that allow local governments to place a lien on real property when an owner fails to pay property taxes. These tax liens almost always have priority over all other encumbrances, including mortgages, regardless of when the tax lien is imposed. If the delinquent taxes remain unpaid for a certain period after notice is provided, the local government can initiate a tax foreclosure process. This process typically does not involve court oversight and culminates in either the sale of the property or sale of the lien at public auction. While bidding processes vary, most states follow one of three approaches to address properties with delinquent taxes:

Tax Deed Sale: In some states, the property itself is sold at a tax sale auction.[2] The proceeds from the sale are used to satisfy the outstanding tax bill and pay any costs of the sale. Any remaining surplus is returned to the owner. The purchaser receives a deed to the property.

---

[2] *See, e.g.*, Ark. Code Ann. §§ 26-37-201, 26-37-202; Ga. Code Ann. § 48-4-1(a)(1); N.C. Gen. Stat. § 105-374.

In states that provide a redemption period, the deed may be delayed or conditioned on the expiration of that period.

Tax Lien Certificate Sale: In other states, something less than full title to the property is initially sold at a tax sale. The purchaser typically receives an assignment of the tax lien and the right to enforce the lien.[3] This is often referred to as a tax lien "certificate." *See* OCC Bulletin 2004-39 (Aug. 31, 2004), as amended ("A tax lien certificate transfers to a third party the taxing authority's right to collect delinquent property taxes and the right to foreclose on the property."). If the redemption period expires without payment by the property owner, the purchaser can then start a court action or administrative process to foreclose the redemption right and obtain full title to the property.

Strict Foreclosure: In a few states, there is no property sale at all, or it may not occur until after the property is transferred to the taxing authority, which simply executes on its tax lien by taking the property.[4] After the property owner is given notice of the tax lien and a period to

---

[3] *See, e.g.*, Colo. Rev. Stat. §§ 39-11-115, 39-11-117, 39-11.5; Fla. Stat. §§ 197.432, 197.502; N.J. Stat. Ann. § 54:5-46.

[4] *See, e.g.*, Alaska Stat. §§ 29-45-390, 29-45-450; Mich. Comp. Laws § 211.78m.

pay the outstanding taxes, the local taxing authority takes the property free and clear of all liens. Once the property is taken, state law generally has a procedure for final disposition of the property, usually permitting the taxing authority to keep the property for public use or sell it at an auction. In *Tyler v. Hennepin Cnty.*, 598 U.S. 631 (2023), the Supreme Court held that a strict foreclosure process that fails to return surplus equity to the former owner violates the Takings Clause of the Fifth Amendment.

West Virginia's Tax Foreclosure Process: As detailed in Appellant's brief, prior to 1994 West Virginia used a tax deed sale model under which property was sold at public auction with surplus proceeds returned to the property owner. Appellant's Brief at 4. Subsequently, West Virginia amended its statutory tax foreclosure scheme. Under the current framework, the process begins as a tax lien certificate sale but concludes as a strict foreclosure. In this hybrid, in which government conveys sells a tax lien but conveys absolute title to the property, there is no mechanism to compute the value of surplus equity or to compensate the owner for the loss of equity.

In West Virginia, like in other states, unpaid property taxes automatically become a lien on the real property to which they relate. W. Va. Code Ann. §§ 11A-1-2, 11A-2-10. After the property tax delinquency is certified, the **tax lien** is sold at public auction. *Id.* §§11A-3-42, 11A-3-45. Following the tax lien sale, the West Virginia State Auditor's Office must determine whether the lien sale is in the best interest of the State and must either approve or disapprove the lien sale. *Id.* § 11A-3-51. Within 120 days following approval of the sale by the Auditor, the purchaser may begin the process to obtain a deed for the property by preparing a list of those entities to be served with notice of the right to redeem required by section 11A-3-54, usually by conducting a title examination of the property as noted in section 11A-3-56(a)(3). *Id.* § 11A-3-52. The purchaser must then request that the Auditor prepare and serve the notice on the parties identified on the list in the manner required by section 11A-3-55 and provide the Auditor with funds needed to cover the service costs. *Id.* § 11A-3-52. If the owner or other interested parties do not redeem within the time specified in the notice, which can be no earlier than 30 days after the notices were served, the purchaser may request a quitclaim deed for the property. *Id.* § 11A-3-59. The owner

may redeem at any time before a tax deed is issued. *Id*. § 11A-3-56. Upon issuance of the deed, the right to redeem is foreclosed and the tax lien purchaser obtains fee simple title. *Id*. § 11A-3-59.

While West Virginia permits the former owner to bring an action to recover the "surplus", this amount is defined narrowly based on the proceeds from the sale of the tax lien. Absolute title to the property is not offered for sale at the auction, or at any other time. However, the tax lien carries with it the possibility of eventual title transfer if all of the statutory conditions are met. The amount of the "surplus" is thus limited to the difference between the amount the purchaser paid for the tax lien and the amount of taxes, costs, and interest due at the time of sale. *Id*. § 11A-3-65.

For example, if the total amount of delinquent taxes, costs, and interest was $100 at the time of sale and the tax purchaser paid $2700 for the tax lien, the amount of "surplus" would be $2600.[5] The "surplus" would be the same under West Virginia law regardless of whether the

---

[5] Appellant argues that because the tax lien on his property was sold at a Sheriff's auction pursuant to a now-repealed West Virginia law, he was not even eligible to seek return of the narrowly defined "surplus." *See* Appellant's Brief, at 27-29.

actual value of the property was $50,000, $100,000 or a $1 million. Thus, West Virginia's definition of surplus is based on something less than the actual value of the property and is an insufficient measure of the owner's surplus equity. It is fundamentally different than the "surplus in excess of the debt owed" referenced in *Tyler,* 598 U.S. at 642, which depends on the value of the property and for which just compensation is required.

**B.  West Virginia's Current Tax Foreclosure Process that Does Not Compensate the Former Owner for Surplus Equity in Excess of the Tax Debt Owed Violates the Takings Clause of the Fifth Amendment and is Unconstitutional.**

>   1.  *The Takings Clause Protects Surplus Equity after a Tax Foreclosure*

The Supreme Court made clear in *Tyler* that after a tax foreclosure the former owner retains a protected interest in the surplus equity. 598 U.S. at 639; *see also Grady v. Wood Cty. W.V.*, -- F.Supp.3d --, 2025 WL 1234111, at *5 (S.D.W.V. Apr. 29, 2025) ("Plaintiffs have a protected interest in the equity of their home in excess of the debt owed."). *Tyler*'s conclusion was grounded in the historical understanding that the government can take no more than what it is owed and when it takes absolute title to property worth more than the tax debt, it must provide just compensation for the excess value. 598 U.S. at 639-40.

The Fifth Amendment, made applicable to the States through the Fourteenth Amendment, explicitly provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. AMEND. V. This constitutional guarantee is self-executing with respect to compensation, meaning that a property owner acquires an irrevocable right to just compensation immediately upon a taking. *See Knick v. Township of Scott*, 588 U.S. 180, 189-192 (2019). The Supreme Court has consistently recognized that a property owner's right to just compensation arises "as soon as the government takes his property without paying for it." *Knick*, 588 U.S. at 190. That constitutional obligation cannot be avoided merely because the taking arises through the debt collection process. While the government may have the power to sell property to recover unpaid taxes, it may not "use the toehold of the tax debt to confiscate more property than was due." *Tyler*, 598 U.S. at 639. If the government (or third party to whom the government conveys title) retains more than what is needed to satisfy the debt without paying just compensation, it violates the Takings Clause.

An owner's entitlement to just compensation depends on whether the property taken was worth more than the tax debt when the

government conveyed absolute title. The proper measure of compensation is not what the government gains, but what the property owner loses. *See Brown v. Legal Foundation of Washington*, 538 U.S. 216, 236 (2003), quoting *Kimball Laundry Co. v. U.S.*, 338 U.S. 1 (1949) (Douglas, J., dissenting). That is, "the property owner 'is entitled to be put in as good a position pecuniarily as if his property has not been taken.'" *In re Upstream Addicks and Barker (Texas) Flood-Control Reservoirs*, 162 Fed. Cl. 495, 519 (2022).

Further, the constitutional harm does not hinge on whether the windfall goes to the government or to a private party. The Supreme Court has rejected any distinction based on the identity of the recipient finding that the key inquiry is whether the government has taken the property for itself or someone else. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021). The core concern of the Takings Clause is not what the government keeps, but whether the government deprived the original owner of his vested property interest without just compensation. In the tax foreclosure context, the government may not take more property than is necessary to satisfy the debt and retain the surplus, or give the surplus

to someone else, without violating the Takings Clause. *See Tyler*, 598 U.S. at 639; *Grady*, 2025 WL 1234111, at \*6.

West Virginia's tax foreclosure system, under which the government transfers absolute title to a third party without compensating the former owner for the surplus equity, falls squarely under the definition of an unconstitutional taking described in *Tyler*.

    2.    *Surplus Equity Must Be Based on Fair Market Value of the Property at the Time of the Taking*

The measure of surplus equity must necessarily begin with fair market value of the property at the time of the taking. As courts have consistently recognized, "[j]ust compensation is determined according to a before-and-after approach that gauges 'the difference in the market value of the property taken before and after the taking.'" *Upstream Addicks*, 162 Fed. Cl. at 519; *see also Sinclair v. Cty. of Oakland*, 2025 WL 1489543, at \*7 (E.D. Mich. May 23, 2025) (to calculate surplus equity "the jury will be asked to determine the fair market value of each property…and to deduct from that amount the unpaid delinquent tax amount"). Accordingly, the determination of whether surplus equity exists and how much just compensation is owed must begin with a fair market valuation of the property. This is so because the surplus equity—

the "before the taking" value—is the fair market value of the property less the sum of all enforceable liens and encumbrances, including unpaid taxes. Where the government extinguishes that ownership interest by transferring absolute title to itself or a third party, the "after the taking" value of the former owner's equity interest is effectively zero. Just compensation under the Fifth Amendment demands that the government pay the former owner the difference between the two.

West Virginia law aligns with this framework. For purposes of determining the tax assessed on real property, state law provides that all property:

> shall be assessed as of July 1 at sixty percent of its **true and actual value**, that is to say, at **the price for which the property would sell if voluntarily offered for sale by the owner** thereof, upon the terms as the property, the value of which is sought to be ascertained, is usually sold, and not the price which might be realized if the property were sold at a forced sale.

W. Va. Code § 11-3-1 (emphasis added). West Virginia courts have consistently held that the purchase price paid for property in a recent arm's length transaction, while not conclusive, is relevant evidence of its true and actual value. *See Wright v. Banks*, 753 S.E.2d 100, 103-04 (W. Va. 2013). Courts also routinely consider other evidence of true and

actual value such as an appraisal performed by a licensed appraiser. *See, e.g., Berkeley Cty. Council v. Gov't Prop. Income Trust LLC*, 880 S.E.2d 487 (W. Va. 2022) (discussing competing methodologies used by assessor's appraiser and taxpayer's appraiser in valuation challenge).

Returning to the example above assume the fair market value of a home at the time the tax purchaser obtains absolute title is $65,000 and the total amount of delinquent taxes, costs, and interest is $100. If there are no additional encumbrances, the former owner's surplus equity is $64,900. When the government takes the property and transfers title without compensation, it extinguishes that $64,900 in equity. Under the Fifth Amendment and *Tyler*, just compensation is constitutionally required for that loss.

Ultimately, surplus equity, in which property owners have a vested interest, cannot be meaningfully defined without first determining the fair market value of the property at the time of the taking. This valuation forms the foundation for calculating just compensation under the Takings Clause.

3. *West Virginia's Narrowly Defined Concept of "Surplus" is Constitutionally Deficient*

Under current West Virginia law, a former property owner has the right to bring a claim to recover the narrowly defined and constitutionally insufficient "surplus" from the tax foreclosure process. Specifically, the statute provides that the former owner is entitled only to "the surplus received from the sale over and above the taxes and interest charged or chargeable thereon including all costs of the sale…" W. Va. Code § 11A-3-65. That is, the owner is entitled to the amount paid for the **tax lien** before the property has been taken less the delinquent taxes, costs, and interest owed. For example, if the market value of the property was $65,000, the total amount of the tax debt was $100, and the tax purchaser paid $2700 for the tax lien, the statutory "surplus" would be just $2600 (price paid for the tax lien minus tax debt). This "surplus" is the only compensation available to the former owner under West Virginia's tax foreclosure scheme. Crucially, this definition of "surplus" is untethered from the fair market value of the property and fails to account for the former owner's vested interest in the surplus equity at the time of the title transfer.

Here, the outstanding tax debt on Mr. Wright's property was $79.89. JA0006, ¶36.[6] The tax lien on Mr. Wright's property was auctioned at public sale, and the successful bidder purchased the lien for $2700. JA006, ¶37. The subsequent Notice of Right to Redeem claimed an amount due of $1096.05, plus an administrative charge of $35. JA008, ¶48. Prior to the confiscation of the property, the fair market value of the property was between $65,000 and $69,000. JA008, ¶49. The tax lien purchaser received more than just a lien; it ultimately received absolute title to Mr. Wright's property; Mr. Wright received no compensation for his surplus equity. JA008, ¶50. Assuming that Mr. Wright could have claimed the statutory "surplus" under W. Va. Code § 11A-3-65, he would have recovered approximately $1604 (price paid for the tax lien minus tax debt). The difference between the statutory "surplus" he would have received and his equity in the property just prior to the transfer of title was more than $60,000. Rather than Mr. Wright receiving the constitutionally required value of his "surplus equity," Mr. Wright lost

_____

[6] JA citations are to the Joint Appendix, Dkt No. 19. Because the case below was dismissed for failure to state a claim, amicus curiae assumes the truth of all factual allegations in the complaint as the district court was required to do when assessing the legal sufficiency of the pleadings.

the entirety of his equity in the property, while the government and the third party walked away with windfalls.

In contrast to West Virginia, other states that initially sell only a tax lien (tax lien certificates) or transfer the property without a sale (strict foreclosure) appropriately determine excess value later in the process by reference to market value determined through a court process, administrative process, or public auction. For example, in Michigan, a former owner may file a claim in the circuit court following a tax foreclosure to recover surplus proceeds. Mich. Comp. Laws § 211.78t. After a hearing, the court determines the relative priority and value of the interest of each claimant in the foreclosed property immediately before the foreclosure. *Id.* In Massachusetts, the tax lien purchaser must either sell the property at public auction or have the property appraised to establish the excess equity. Mass. Gen. Laws ch. 60, § 64A. And, in South Dakota, one of the first states to reform its system following *Tyler*, the purchaser of the tax lien certificate who acquires the property by tax deed must offer the property at public auction. S.D. Codified Laws § 10-25-39.2. Following the sale, excess sale proceeds must be returned to the prior owner. *Id.* § 10-25-39.

The district court in this case held that West Virginia's "surplus" recovery mechanism was constitutionally sufficient. JA195. It is not. West Virgina's process offers no meaningful opportunity for a former owner to recover the value of the equity lost through the tax foreclosure. Indeed, because West Virginia does not anchor its definition of "surplus" to the fair market value of the property, it fails to provide just compensation as required by the Fifth Amendment and is constitutionally deficient.

## CONCLUSION

The Takings Clause of the Fifth Amendment prohibits the government from taking more than what is owed. Yet that is precisely what West Virginia's tax foreclosure scheme permits. By allowing third party tax lien purchasers to obtain absolute title to valuable property without compensating the former owner for lost equity, the government acts in contravention to the Supreme Court's holding in *Tyler* and the dictates of the Fifth Amendment. The district court erred in concluding that the "surplus" claims process under West Virginia law, assuming its applicability, was constitutionally sufficient. Because the statutory definition of "surplus" is linked to the value of the tax lien instead of the

fair market value of the property, the system fails to provide just compensation as required by the Takings Clause. In this case, the confiscation of property worth more than $65,000 for an original tax debt of $79.89 is not only unjust, it is unconstitutional.

Mr. Wright has plausibly alleged a taking under section 1983 and the Fifth Amendment. The district court's judgment should be reversed.

Respectfully submitted,

/s/ Jennifer S. Wagner
Jennifer S. Wagner
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square
Boston, MA 02110
(617) 542-8010
jwagner@nclc.org

Dated: July 25, 2025

## CERTIFICATION OF BAR MEMBERSHIP

I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Fourth Circuit.

/s/ Jennifer S. Wagner
Jennifer S. Wagner

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. Rule 29(a)(5) and Fed. R. App. P. 32(a)(7), this brief, exclusive of the certifications, tables of contents and authorities, disclosure statement, and the identity of counsel at the end of the brief, is 3,960 words in text and footnotes as counted by Microsoft Word, the word processing system used to prepare this brief. This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century 14-point font.

I certify under penalty of perjury that the foregoing is true and correct.

/s/ Jennifer S. Wagner
Jennifer S. Wagner

**CERTIFICATE OF SERVICE**

I, Jennifer S. Wagner, counsel for amicus curiae, National Consumer Law Center, certify that, on July 25, 2025, a copy of the attached Brief was filed electronically through the CM/ECF system with the Clerk of this Court. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Jennifer S. Wagner
Jennifer S. Wagner