**No. 25-1402**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

ANTHONY D. WRIGHT

Plaintiff-Appellant,

v.

MARK HUNT, as successor to G. RUSSELL ROLLYSON, Deputy Commissioner of Delinquent and Non-entered Lands, in his official capacity only, and 21 WVC, LLC, f/k/a WV COUNTY TAX CERT PURCHASES 2021, LLC,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA (No. 2:24-CV-00474)

---

# REPLY BRIEF OF PLAINTIFF-APPELLANT ANTHONY D. WRIGHT

---


Bren J. Pomponio, Esq.
Gary M. Smith, Esq.
MOUNTAIN STATE JUSTICE, INC.
1217 Quarrier Street
Charleston, WV 25301
Office/Fax: (304) 344-3144
bren@msjlaw.org
gary@msjlaw.org
*Counsel for Plaintiff-Appellant*

TABLE OF CONTENTS


TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iv

REPLY TO 21 WVC RESPONSE BRIEF ..... 1

A. Reply to 21 WVC, LLC's Jurisdictional Statement. ..... 1

B. This Court Should Reverse the Lower Court's Dismissal of Wright's Fifth Amendment Claim and Remand for Discovery and Trial. ..... 4

1. *Pung v. Isabella County* supports rather than precludes Wright's Fifth Amendment claim. ..... 4

2. *Nelson v. City of New York*, 352 U. S. 103 (1956), does not bar Wright's Fifth Amendment claim because Wright had no remedy pursuant to W. Va. Code § 11A-3-65. ..... 9

3. West Virgina's tax lien auction is not the type of tax sale fairly conducted in light of our country's history of tax sales. ..... 11

C. This Court Should Reverse the Lower Court's Dismissal of Wright's Eighth Amendment Claim. ..... 14

1. *Pung* does not preclude Wright's Eighth Amendment claim. ..... 14

2. Historical practice demonstrates strict foreclosure of land to collect a debt is unconscionable because it exacts a penalty beyond the amount of the debt owed. ..... 15

3. The district court erred as a matter of law in holding West Virginia's strict foreclosure tax deed system was plainly remedial. ..... 17

D. The District Court's Dismissal of Wright's Fifth Amendment and Eighth Amendment Claims May Not Be Upheld on 21 WVC's Argument That it Was Not a State Actor. ..... 19

1. The district court found 21 WVC conceded that it was a state actor. ..... 19

2. The complaint sufficiently alleges 21 WVC was state actor. .......................... 20
3. *Tunstall v. Office of Judicial Support of Court of Common Pleas* is inapplicable and distinguishable. ............................................................... 21
4. 21 WVC shares liability for Wright's injuries as a joint tortfeasor and a member of a civil conspiracy under West Virginia law. .................................. 22
REPLY TO RESPONSE OF MARK HUNT ........................................................24
A. This Court Should Reverse the Lower Court's Dismissal of Wright's Fifth Amendment Claim and Remand for Discovery and Trial. ................................. 24
1. Wright need not seek state remedies before seeking redress pursuant to 42 U.S.C. § 1983 for an unconstitutional taking without just compensation. .. 24
2. Neither W. Va. Code § 11A-3-10 nor § 11A-3-32 provided Wright with the right to claim surplus funds. ......................................................................... 26
3. The district court never considered the proper measure for just compensation because it erroneously concluded no taking occurred. .................................... 27
B. This Court Should Reverse the Lower Court's Dismissal of Plaintiff-Appellant's Eighth Amendment Claim and Remand It for Discovery and Trial. 29
C. There is a Factual Dispute Whether Hunt Is Entitled to Sovereign Immunity. 32
CONCLUSION AND REQUEST FOR RELIEF ..................................................36

## TABLE OF AUTHORITIES

**Cases**

*Albert v. Lierman*, 152 F.4th 554 (4th Cir. 2025)....................35

*Ancient Energy, Ltd. v. Ferguson*, 806 S.E.2d 154 (W. Va. 2017).................... 12, 17

*Austin v. United States*, 509 U.S. 602 (1993) .................... 18, 19, 30

*BFP v. Resolution Trust Corp.*, 511 U. S. 531 (1994) ....................12

*Blitz v. Napolitano*, 700 F.3d 733 (4th Cir. 2012) ....................3

*Bowles v. Sabree*, 121 F.4th 539 (6th Cir. 2024)....................8

*Britt v. Dejoy*, 45 F.4th 790, 795-96 (4th Cir. 2022) ....................4

*CMYK Enters. v. Advance Print Techs. LLC*, 154 F.4th 1329 (11th Cir. 2025).........2

*Columbia Gas Transmission LLC v. Tri-State Airport Auth.*, 2016 U.S. Dist. LEXIS 57792 (S.D.W. Va. 2016)....................23

*Continental Resources v. Fair*, 317 Neb. 391 (2024) ....................7

*DeVilliers v. Texas*, 601 U.S. 285 (2024) .................... 34, 35

*Dunn v. Rockwell*, 689 S.E.2d 255 (W. Va. 2009) ....................23

*Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991) ....................21

*Ethridge v. Harbor House Restaurant*, 861 F.2d 1389 (9th Cir. 1988) ....................2

*Flack v. Hunt*, No. 2:25-cv-00253, 2025 U.S. Dist. LEXIS 203373 (S.D. W. Va. Oct. 15, 2025).................... 35, 36

*Folse v. Rollyson*, 895 S.E.2d 244 (W. Va. Ct. App. 2023).................... 12, 17, 31

*Gelboim v. Bank of Am. Corp.*, 574 U.S. 405 (2015)....................3

*GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170 (4th Cir. 2007) ....................3

*Grady v. Wood County*, 2025 U.S. Dist. LEXIS 5293, 2025 WL 72160 (S.D.W. Va. Jan. 10, 2025)....................7

*Grady v. Wood County*, 786 F. Supp. 3d 984 (S.D.W. Va. 2025)....... 7, 19, 26, 30 31

*Green v. Mansour*, 474 U.S. 64 (1985) ....................35

*Hall v. Meisner*, 51 F.4th 185 (6th Cir. 2022) ....................................................7, 12

*Hill v. Potter*, 352 F.3d 1142 (7th Cir. 2003) ..........................................................3

*Hutto v. South Carolina Ret. Sys*., 773 F.3d 536 (4th Cir. 2014) ............................32

*Kimble v. United States*, 991 F.3d 1238 (Fed Cir. 2021).......................................10

*Knick v. Twp. of Scott*, 588 U.S. 180 (2019) .................................................. 25, 32

*Korangy v. FDA*, 498 F.3d 272 (4th Cir. 2007)............................................... 19, 30

*Lansing v. Goelet*, 9 Cow. 346, 355, 1827 WL 2536 (N.Y. 1827)..........................16

*Lugar v. Edmondson Oil,* 457 U.S. 922 (1982) .....................................................22

*McClure v. Maitland*, 24 W. Va. 561, 1884 W. Va. LEXIS 83 (W. Va. 1884) .........13

*Mingo Cnty. Redevelopment Auth. v. Green,* 534 S.E.2d 40 (W. Va. 2000) ...........12

*Moulton v. Cornish*, 138 N.Y. 133, 141, 33 N.E. 842 (1893) .................................16

*Nelson v. City of New York*, 352 U. S. 103 (1956) .................................................12

*Perry v. Schumacher Grp. of La*., 891 F.3d 954 (11th Cir. 2018).............................2

*Plemons v. Gale*, 396 F.3d 569, 572 n.3 (4th Cir. 2005) ........................................21

*Pung v. Isabella County*, 609 U.S. __, 146 S. Ct. 1964, 225 L. Ed. 2d 373, 2026 U.S. LEXIS 2715 (June 23, 2026)............................................................... *passim*

*State v. Gray*, 52 S.E.2d 759 (W. Va. 1949) ...........................................................13

*Stead's Ex'rs v. Course*, 8 U.S. 403 (1808) ............................................................16

*Strahin v. Cleavenger*, 603 S.E.2d 197 (W. Va. 2004)............................................23

*Swint v. Chambers County Comm'n*, 514 U.S. 35 (1995) .......................................3

*Thornton v. M7 Aerospace LP*, 796 F.3d 757 (7th Cir. 2015)...................................4

*Tulsa Professional Collection Service v. Pope*, 485 U.S. 478 (1988) ....................21

*Tunstall v. Office of Judicial Support of Court of Common Pleas*, 820 F.2d. 631 (3rd Cir. 1987)...........................................................................................................21

*Tyler v. Hennepin Co., Minn*., 598 U.S. 631 (2023) ............................ 6, 7, 8, 19, 31

*United States v. Bajakajian*, 524 U.S. 321 (1998) ..................................................18

*United States v. Hope*, 28 F.4th 487 (4th Cir. 2022) ..............................................10

*United States v. Lawton*, 110 U.S. 146 (1884)....................................................12

*United States v. Robinson*, 744 F.3d 293 (4th Cir. 2014).........................................9

*United States v. Taylor*, 104 U. S. 216 (1881) ....................................................12

*United States v. Webb*, 738 F.3d 638 (4th Cir. 2013)...........................................10

*W. Va. DOT, Div. of Highway v. W. Pocahontas Props., Ltd. P'ship*, 777 S.E.2d 619 (W. Va. 2015)....................................................................................29

*W. Va. Lottery v. A-1 Amusement, Inc.*, 807 S.E.2d 760 (W. Va. 2017)..................33

*Yee v. City of Escondido*, 503 U.S. 519 (1992) ....................................................10

*Zito v. N.C. Coastal Res. Comm'n*, 8 F.4th 281 (4th Cir. 2021)....................... 32, 35

**Constitutions**

W. Va. Const. art XIII, § 4.......................................................................... 13, 28

**Statutes**

28 U.S.C. § 1291 ........................................................................... 1, 3, 4

42 U.S.C. § 1983 ........................................................................... 19, 25

W. Va. Code § 11A-3-1 ...............................................................................6

W. Va. Code § 11A-3-5 ...............................................................................18

W. Va. Code § 11A-3-10 ...............................................................................26

W. Va. Code § 11A-3-32 ...............................................................................26

W. Va. Code § 11A-3-42 ...............................................................................12

W. Va. Code § 11A-3-45 ...............................................................................9

W. Va. Code § 11A-3-48 ...............................................................................9

W. Va. Code § 11A-3-52 ...............................................................................22

W. Va. Code § 11A-3-59 ...............................................................................6, 16

W. Va. Code § 11A-3-62 ...............................................................................6

W. Va. Code § 11A-3-65 ........................................................9, 10, 11, 26, 27

W. Va. Code § 11A-4-2 ...............................................................................33

W. Va. Code § 55-7-13c ........................................................................................23

**Rules of Procedure**

*Federal Rule of Civil Procedure* 41(a)(1)(A)(ii) .......................................................2

**Treatise**

Story, *Commentaries on Equity Jurisprudence* .......................................................16

## REPLY TO 21 WVC RESPONSE BRIEF

### A. Reply To 21 WVC, LLC's Jurisdictional Statement.

Defendant-Appellee 21 WVC, LLC ("21 WVC") argues this Court lacks jurisdiction under 28 U.S.C. § 1291 because Plaintiff-Appellant filed a notice of voluntary dismissal of only Counts III and IV of the multi-count complaint, signed by all parties, before judgment was entered against him. JA170-71. 21 WVC contends that stipulation (1) must be found to have dismissed the entire action, or (2) was legally ineffectual, such that the lower court's March 17, 2025, Judgment did not constitute a final judgment because Count IV remained pending.

This Court has jurisdiction over this appeal. The joint stipulation of voluntary dismissal signed by all the parties below stated facially that the stipulation was to voluntarily dismiss only two identified claims: Count III (Due Process) and Count IV (Equal Protection). JA170. 21 WVC signed the stipulation as it was worded and is estopped from arguing that the stipulation had any legal effect broader than its actual wording. Moreover 21 WVC moved in the lower court to dismiss the action on this argument, and the District Court rejected that motion. JA191. 21 WVC did not preserve that issue by filing a cross-appeal contesting the denial of its motion.

Even if the Court were to consider this argument under a plain error analysis, it still fails. 21 WVC essentially argues that a mere reference to *Federal Rule of Civil*

*Procedure* 41(a)(1)(A)(ii) is sufficient to work a voluntary dismissal of the entire action, even though the parties did not stipulate to such and even though the parties did not intend the stipulation to have that effect. That argument is not consistent with the plain requirements of Rule 41(a)(1)(A)(ii), which require an actual stipulation for voluntary dismissal of the action, signed by all parties, as evidence of an intent to dismiss the entire action. While it may be true that a Rule 41 stipulation of voluntary dismissal of an action is "all or nothing" *once a stipulation to that effect is filed*, the point is irrelevant because no such stipulation was ever filed in the lower court in this case.

Additionally, as 21 WVC itself argued below, JA178-81, the "voluntary dismissal by stipulation" rule is only available to dismiss an "action," not individual claims from a multi-claim complaint. *See Perry v. Schumacher Grp. of La.*, 891 F.3d 954, 958 (11th Cir. 2018); *Ethridge v. Harbor House Restaurant*, 861 F.2d 1389, 1392 (9th Cir. 1988) (listing authorities). When parties mistakenly file a Rule 41(a)(1)(A)(ii) stipulation of voluntary dismissal purporting to apply to fewer than all claims asserted, that stipulation is "invalid upon filing" and ineffectual to dismiss anything. *See CMYK Enters. v. Advance Print Techs. LLC*, 154 F.4th 1329, 1332, 1336-37 (11th Cir. 2025). Plaintiff-Appellant's action was never voluntarily dismissed by a stipulation to that effect as required to deprive this Court of jurisdiction.

21 WVC contends this Court still lacks 28 U.S.C. § 1291 appellate jurisdiction because Count IV of the complaint, an equal protection claim, was not expressly analyzed and disposed of in the lower court's March 17, 2025, Memorandum Opinion and Order. JA189–201. According to 21 WVC, the defective stipulation to dismiss Count IV was ineffectual, Count IV remained pending, and therefore no final order exists.

The test for 28 U.S.C. § 1291 finality is pragmatic: does the separately entered Rule 58 judgment demonstrate the court was "finished with the case." *Blitz v. Napolitano*, 700 F.3d 733, 738 (4th Cir. 2012); *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 176 (4th Cir. 2007) (quoting *Hill v. Potter*, 352 F.3d 1142, 1144 (7th Cir. 2003)). "A final decision is one by which a district court disassociates itself from a case." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 408 (2015) (citing *Swint v. Chambers County Comm'n*, 514 U.S. 35, 42 (1995)). The lower court entered a Rule 58 judgment separate from its opinion on March 17, 2025. That Judgment "**ORDERS** that this case be **DISMISSED** and **STRICKEN** from the docket." JA201. This language clearly demonstrates the lower court was done with the action; dismissing the case and striking it from the docket "disassociated" the district court from the action and prevented any further proceedings.

It is true that the lower court failed expressly to analyze and adjudicate the Count IV equal protection claim in its Memorandum Opinion and Order. However,

the Rule 58 Judgment dismissing the case, and ordering the case be stricken from the docket, without granting leave to amend, "necessarily adjudicated" that claim adversely to Plaintiff-Appellant. *See Thornton v. M7 Aerospace LP*, 796 F.3d 757, 763-764 (7th Cir. 2015) (although decision on summary judgment did not expressly address all pending claims, Rule 58 judgment made plain lower court was done with case, so Rule 58 judgment was final appealable order). The fact that the March 17, 2025, Rule 58 Judgment did not expressly address Count IV in its opinion is without jurisdictional significance.

Moreover, in neither the Memorandum Opinion nor Judgment did the lower court state that the dismissal was made without prejudice or that Wright was given leave to amend. *See Britt v. Dejoy*, 45 F.4th 790, 795-96 (4th Cir. 2022). The March 17, 2025, Judgment was therefore a final appealable order, and this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

### B. This Court Should Reverse the Lower Court's Dismissal of Wright's Fifth Amendment Claim and Remand for Discovery and Trial.

#### 1. *Pung v. Isabella County* supports rather than precludes Wright's Fifth Amendment claim.

*Pung v. Isabella County*, 609 U.S. __, 146 S. Ct. 1964, 225 L. Ed. 2d 373, 2026 U.S. LEXIS 2715 (June 23, 2026), held those whose tax delinquent properties are taken in a tax foreclosure sale may not claim the property's fair market value as just compensation if title to the property was sold at public foreclosure auction, "at

least when the sale is fairly conducted in light of our country's history of tax sales." In those circumstances just compensation under the Fifth Amendment is measured by the difference between the tax debt and the auction price paid to obtain title. *Pung*, 146 S. Ct. at 1970. Importantly, *Pung* was premised on the principle that the tax sale was indeed a taking for Fifth Amendment purposes and only discussed the measure of just compensation.

The Pung home was taken by the County for a disputed tax debt by means of a judicial foreclosure action. Once the judgment of foreclosure was entered, title to the property was sold at a public foreclosure auction to the highest bidder. Pung filed suit contending that the surplus $73,766.07 over the tax debt paid at the foreclosure auction to obtain ownership of the property was not the proper measure of "just compensation." Pung argued the proper measure of "just compensation" in his situation was the property's fair market value before the foreclosure not the value represented by the price paid at the foreclosure auction to obtain ownership.

The district court dismissed the Fifth Amendment claim and Pung appealed. The Sixth Circuit upheld that dismissal holding:

> "'[A] plaintiff whose property is foreclosed and sold at a public auction for failure to pay taxes is [not] entitled to recoup the fair market value of the property.'" App. to Pet. for Cert. 11a (Pet. App.). Instead, "'when a municipality sells foreclosed property at a properly conducted auction,' the owner is entitled to 'the amount of the sale above his debt and no more.'"

*Pung*, 146 S. Ct. at 1967-68.

The Supreme Court granted certiorari at Pung's request, defining the issues before it at the outset:

> In *Tyler v. Hennepin County*, 598 U. S. 631, 143 S. Ct. 1369, 215 L. Ed. 2d 564 (2023), we held that the Fifth Amendment Takings Clause requires the government to return any surplus proceeds from tax foreclosure sales, *i.e*., the difference between the sale price and the taxpayer's debt. The question presented here is whether the government must pay more when the sale price falls below the property's hypothetical fair market value. In other words, is the constitutional baseline for "just compensation" the actual tax-sale price or the price that someone would pay for the property in a hypothetical open-market transaction?
>
> We conclude that the proper baseline under the Takings Clause is the price obtained in a tax sale, at least when the sale is fairly conducted in light of our country's history of tax sales. We also hold that, following a tax sale, the Eighth Amendment Excessive Fines Clause does not require the government to return more than the surplus proceeds.

*Id.* at 1967.

The West Virginia tax deed system does not provide for, require, permit, or allow the sale of title to tax-delinquent properties through a public foreclosure auction in which ownership is sold to the highest bidder. *See* W. Va. Code § 11A-3-1 *et seq.* Title to tax delinquent property and all rights in it are transferred solely by administrative action and a statutory tax deed form, without judicial involvement, foreclosure sale, or public bidding to purchase. *See* W. Va. § 11A-3-59, -62. Pursuant to West Virginia's tax lien sale/tax deed process, 21 WVC took title to Mr. Wright's property by strict foreclosure of the tax lien it purchased. *Pung* did not have before

it a case like this one, in which state law did not allow for a public foreclosure auction of title and no foreclosure auction of title was never held.

However, the Sixth Circuit Court of Appeals reviewed circumstances more like this case in *Hall v. Meisner*, 51 F.4th 185 (6th Cir. 2022).[1] Under Michigan law at the time, a county took a $300,000.00 home for non-payment of $22,262.00 in delinquent taxes. The county then gave title of the home to the taxing district to which the taxes were owed. That district transferred title to the home to a for-profit entity for $1.00 without selling it through a public foreclosure auction. The for-profit entity then sold the property for $308,000.00.

The Sixth Circuit thoroughly analyzed the historical background of tax seizures and how, through developing concerns for fairness and equity, "foreclosure by sale" became the American standard for tax seizures in contrast to "strict foreclosure" like that the Michigan statutes allowed.[2] Forecasting *Pung*, the government argued the owner's constitutional right to compensation was limited to

[1] Cited with approval by the Supreme Court in *Tyler v. Hennepin Co.,* 598 U.S. at 638, and by the Southern District of West Virginia in *Grady v. Wood County*, 786 F. Supp. 3d 984, 991 (S.D.W. Va. 2025).

[2] "Strict foreclosure" refers to forfeiture of the tax delinquent owner's title and all equity in the property. *See Hall*, 51 F. 4th at 191-94. In deciding a motion to dismiss in *Grady*, District Judge Johnston "found few differences" between the West Virginia tax deed system and the "strict foreclosure" process at issue in *Hall* and *Continental Resources v. Fair*, 317 Neb. 391 (2024). *See Grady v. Wood County*, 2025 U.S. Dist. LEXIS 5293, 2025 WL 72160 (S.D.W. Va. Jan. 10, 2025).

the surplus of the proceeds of a public foreclosure auction over the tax debt. The circuit court agreed but pointed out that no such sale had occurred in the *Hall* case. It concluded that Hall had therefore suffered a taking without just compensation. Later, in *Bowles v. Sabree*, the Sixth Circuit summed up what it saw as the law regarding just compensation in tax sale cases:

> A plaintiff can sue for surplus equity when there's no public auction (*Hall*), but not when there is one [*Freed v. Thomas*, 81 F.4th 855 (6th Cir. 2023)].

121 F.4th 539, 547 (6th Cir. 2024). This summation is consistent with both *Pung* and *Tyler v Hennepin Co., Minn.*, 598 U.S. 631. What is clear from these two landmark Supreme Court cases is that a tax sale in any form is a taking, the only question is the measure of just compensation.

Wright's home was taken from him by the administrative issuance of a tax deed. JA008. 21 WVC concedes that fact. *See* 21 WVC Resp. Br. at 14. Wright received no compensation for that taking. JA010. It is therefore beyond doubt that Wright alleges facts constituting a valid Fifth Amendment takings claim. Accordingly, the case should be remanded to the district court for further proceedings regarding the measure for just compensation.

### 2. *Nelson v. City of New York*, 352 U.S. 103 (1956), does not bar Wright's Fifth Amendment claim because Wright had no remedy pursuant to W. Va. Code § 11A-3-65.

The district court dismissed Wright's Fifth Amendment claim on the assertion that he could have sued for the surplus price 21 WVC paid for the tax lien on his home pursuant to W. Va. Code § 11A-3-65. JA195. But that statute only applies to former owners whose home was subject to a tax lien sold by the state Auditor pursuant to W. Va. Code § 11A-3-45 or § 11A-3-48. The tax lien on Wright's home was sold by the Mercer County Sheriff. JA006. The state Auditor, the primary official responsible for implementation of West Virginia's tax collection statutes, "does not dispute that W. Va. Code § 11A-3-65 only applies to Deputy Commissioner's tax sales under W. Va. Code § 11A-3-45 and § 11A-3-48." Mark Hunt's Resp. Br. at 16. Dismissal of Count I of Wright's complaint through the misapplication of W. Va. Code § 11A-3-65 constitutes a plain error of law.

21 WVC does not contend that W. Va. Code § 11A-3-65 applies to Wright. 21 WVC argues only that Wright "waived" the "newly-minted theory." Waiver requires proof of the voluntary relinquishment of a known right. *See United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014). There is no indication, let alone evidence, that Wright voluntarily relinquished or abandoned any right or substantive claim legally available to him. Moreover, once a federal claim is presented to an appellate court, parties may make any argument in support of that claim; parties are

*not* limited to the precise arguments they made below. *See Yee v. City of Escondido*, 503 U.S. 519, 534 (1992); *United States v. Hope*, 28 F.4th 487, 494 (4th Cir. 2022) *Kimble v. United States*, 991 F.3d 1238, 1244 (Fed Cir. 2021).

Even if there were some evidence of waiver, which there is not, the Court may still consider this argument under a plain error standard. The plain error doctrine is longstanding and applies to errors of law that were not objected to at the district court level:

> To establish plain error, [Wright] must show (1) that the district court erred, (2) that the error is clear or obvious, and (3) that the error affected his substantial rights, meaning that it affected the outcome of the district court proceedings. Even when this burden is met, we retain discretion whether to recognize the error and will deny relief unless the district court's error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.

*United States v. Webb*, 738 F.3d 638, 640-41 (4th Cir. 2013) (citations and quotations omitted). Here, the argument that W. Va. Code § 11A-3-65 was not available to Mr. Wright was plain error. First, it is undisputed that the statute does not apply, so the district court erred in concluding relief was available to Mr. Wright. Second the error is plain and obvious. Third, the error affected the outcome of the proceedings: it was a ground for dismissal of Count I. Finally, allowing the dismissal to stand greatly affects the fairness and integrity of the judicial proceeding.

The lower court dismissed that claim, wrongly holding that *Nelson v. City of New York* barred the claim because Wright could have obtained just compensation

through W. Va. Code § 11A-3-65. The district court's dismissal of Wright's Fifth Amendment Claim cannot be upheld based on the availability of a remedy not legally available to Mr. Wright.

### 3. West Virginia's tax lien auction is not the type of tax sale fairly conducted in light of our country's history of tax sales.

21 WVC represents to this Court without analysis that the November 8, 2021, tax lien auction conducted by the Mercer County Sheriff was the type of public tax foreclosure sale "fairly conducted in light of our country's history of tax sales" which *Pung* found sufficient to set the measure of a tax delinquent owner's claim for just compensation. This issue was not argued to the district court by any party and was not addressed by the district court in its Memorandum Opinion and Order. The question became relevant under Fifth Amendment jurisprudence only after this case was on appeal. The Supreme Court has made plain that *Pung* does not identify "the contours of a fair auction or [endorse] the parties' or the United States' articulations of what this standard requires." *Pung*, 146 S. Ct. 1973-74 (Sotomayor, J., Gorsuch, J. and Jackson, J. concurring). In *Tyler* and *Pung*, the Supreme Court reviewed a number of 19th and 20th century cases showing how the Fifth Amendment was historically applied in tax sale cases, using that review to inform its holding. In each of the tax sale cases the Court considered, title to the tax delinquent property had been sold through a public tax foreclosure auction, at which bids were made to buy

ownership of the property.[3] By contrast, West Virginia auctions a tax lien rather than conducting a foreclosure sale of title to the tax delinquent property itself. *See* W. Va. Code § 11A-3-42 (the statutory basis for Auditor's power to sell state tax lien states expressly "References in this chapter to the sale or purchase of certified or non-entered lands by or from the Auditor shall be construed as the sale or purchase of the tax lien or liens thereon"); *Folse v. Rollyson*, 895 S.E.2d 244, 250 (W. Va. Ct. App. 2023) ("Title to the property remains with the tax-delinquent owner until the purchaser completes the tax lien process and secures the deed.") (citing *Ancient Energy, Ltd. v. Ferguson*, 806 S.E.2d 154, 159 (W. Va. 2017)); s*ee also Mingo Cnty. Redevelopment Auth. v. Green,* 534 S.E.2d 40, 48 n.24 (W. Va. 2000) (observing after sale of tax lien by Sheriff, "title still rests with the (soon-to-be-former) owner until the deputy land commissioner conveys a deed at the end of the tax-sale process").

This movement to a system of "strict foreclosure" was contrary to the state's historical practice and historical American standards to which the *Pung* Court looked. *Cf. Hall*, 51 F.4th at 190-194. It seems obvious that when the *Pung* Court concluded that "the proper baseline under the Takings Clause is the price obtained in a tax sale, at least when the sale is fairly conducted in light of our country's history

---

[3] *See United States v. Taylor*, 104 U.S. 216 (1881); *United States v. Lawton*, 110 U.S. 146 (1884); *Nelson v. City of New York*, 352 U. S. 103 (1956); *BFP v. Resolution Trust Corp.*, 511 U. S. 531 (1994).

of tax sales, it was referring to "fairly conducted" tax foreclosure auctions of *title* to tax-delinquent properties. As the Court itself stated:

> "Our Nation's history and this Court's precedent thus establish the principle that when the government *seizes and sells property to collect a tax debt*, the owner is entitled to the surplus sale proceeds—nothing less, and nothing more.

*Pung*, 146 S. Ct. at 1969-1970 (emphasis added). Indeed, Justice Thomas in his concurrence referenced this very case to illustrate an absurd result if a taxpayer could lose the totality of her or his equity in property through a strict foreclosure tax lien auction. *See Pung*, 146 S. Ct. at 1978 n.2 (Thomas, J. concurring).

Finally, the tax lien auction is not even consistent with West Virginia's historical practice. For more than a century, the West Virginia Constitution required a foreclosure sale of title to the property to enforce the tax lien. *State v. Gray*, 52 S.E.2d 759, 769-72 (W. Va. 1949) (discussing W. Va. Const. art XIII, § 4 (repealed in 1994)); *McClure v. Maitland*, 24 W. Va. 561, 568-69, 1884 W. Va. LEXIS 83 (1884).

In any event, this Court need not reach the question on the proper measure of just compensation in this case. The district court dismissed the action on the face of the complaint alone based on the finding that no taking occurred. Only the complaint, JA010-JA011, touched on facts likely relevant to that question. The question is very important to thousands of West Virginians whose homes are and have been lost by tax deed. The record now before this Court is insufficiently developed to properly

analyze whether the auction sale of a $79.89 tax lien on a home constitutes a public tax foreclosure sale "fairly conducted in light of our country's history of tax sales," as *Pung* required.

This Court should reverse the district court's dismissal of Count I and remand for development of a full factual and legal record through discovery and trial.

## C. This Court Should Reverse the Lower Court's Dismissal of Wright's Eighth Amendment Claim.

### 1. *Pung* does not preclude Wright's Eighth Amendment claim.

In *Pung*, Pung argued that the failure to pay fair market value after the foreclosure auction of title to his property constituted an excessive fine in violation of the Eighth Amendment. Wright's complaint similarly alleges that the penalty inflicted upon him by the April 1, 2023, tax deed confiscation of all his title and equity in his home for failure to have paid $79.89 in property taxes constituted an excessive fine in violation of the Eighth and Fourteenth Amendments. JA012.

21 WVC argues that *Pung* precludes Wright's Eighth Amendment for substantially the same reasons the case precludes Mr. Wright's Fifth Amendment claim: whether a fine is punitive must be viewed in light of historical practice. 21 WVC Resp. Br. at 45-46. Wright does not argue *Pung* states otherwise. Rather, the West Virginia system does not comport with historical practice and therefore is punitive and excessive in violation of the Eight Amendment.

As has been conceded, Wright's home was not confiscated by the state's sale of title at a public tax foreclosure auction. Rather the state confiscated Wright's home by issuing an administrative tax deed transferring title and all equity in the home to 21 WVC; Wright was paid nothing. JA009-JA010. The preclusion of Eighth Amendment claims when the property is sold at a "fairly conducted" tax sale and the surplus of the auction's property purchase price is paid to the former owner is plainly distinguishable. There was no "tax sale" here of the type to which the *Pung* holding was limited. Here, the state administratively confiscated Wright's $65,000.00 home to satisfy a $79.89 tax debt after the auction of the tax lien for $2,000. *See Pung*, 146 S. Ct. at 1978 n.2 (Thomas, J. concurring).

**2. Historical practice demonstrates strict foreclosure of land to collect a debt is unconscionable because it exacts a penalty beyond the amount of the debt owed.**

Governmental confiscation of the entire value of property to collect a small debt ("strict foreclosure") has been considered punitive and been disfavored historically:

> By the end of the 18th century American courts of equity had begun to address these issues for themselves. The American courts were uniformly hostile to strict foreclosure in cases—like this one—where the land's value exceeded the amount of the debt. New York's highest court in equity, for example, opined that, in cases where "the mortgaged premises exceed the amount of the debt in value," strict foreclosure would be "unconscionable[.]" *Lansing v. Goelet*, 9 Cow. 346, 355, 1827 WL 2536 (N.Y. 1827). Joseph Story likewise recognized the "unconscionableness" of "taking the land for the money." Story,

> *Commentaries on Equity Jurisprudence* at 106 n.2. In another case the court opined that "strict foreclosure" had "no appropriate place in a system of laws and jurisprudence where . . . the mortgage does not operate as a conveyance of the legal title," but is only "a lien upon the land as security for the debt or other obligation of the mortgagor." *Moulton v. Cornish*, 138 N.Y. 133, 141, 33 N.E. 842 (1893).
>
> ***
>
> American courts' insistence upon foreclosure by sale, rather than strict foreclosure, extended fully to foreclosures for payment of unpaid taxes. Indeed—given the absence of any agreement by the landowner (as with a mortgage) to forfeit the land upon default—the foreclosure remedy was more limited in tax cases. This limitation was the same one prescribed in Magna Charta, and it underscored the precision upon which the courts insisted whenever land was used to satisfy a debt. In an 1808 case, for example, Chief Justice Marshall held that a tax collector had "unquestionably exceeded his authority" when he had sold more land than "necessary to pay the tax in arrear." *Stead's Ex'rs v. Course*, 8 U.S. 403, 414, 2 L. Ed. 660 (1808) . . . .

*Hall*, 51 F.4th at 190-94 (excerpted; some citations omitted).

West Virginia's tax deed system is an example of the disfavored strict foreclosure system. Foreclosure of land to collect a debt for unpaid taxes owed the tax lien holder does not occur by public sale. The Auditor administratively issues a tax deed as "grantor," transferring title and the full value of the tax delinquent property to the third party to whom the delinquent owner owed an unpaid tax debt. The property owner loses all title, interest and equity in the property on issuance of the tax deed. *See* W. Va. Code § 11A-3-62(a); *Ancient Energy, Ltd.*, 806 S.E.2d at 159; *Folse*, 895 S.E.2d at 250. The tax delinquent owner's rights in the land are not foreclosed and title transferred through a public foreclosure sale. The tax delinquent

owner's creditor (*i.e.*, the entity which purchased the tax debt owed the state) is given the entire value of an unredeemed property regardless of how small the tax debt owed, or the reason the tax lien debt was not redeemed. A rational trier of fact could therefore conclude that West Virginia's strict foreclosure tax deed system, which confiscated Wright's $65,000.00 house by April 1, 2023, tax deed because he failed to read a notice correctly and did not pay $79.89 inflicted upon Wright a forfeiture grossly disproportionate to any wrongdoing. *See Pung*, 146 S. Ct. at 1978 n.2 (Thomas, J. concurring) (listing examples of apparent state overreaching in tax confiscation cases and including the facts of this case).

**3. The district court erred as a matter of law in holding West Virginia's strict foreclosure tax deed system was plainly remedial.**

The lower court dismissed Wright's Eighth Amendment claim on that basis that West Virginia's tax deed system was "plainly remedial" and not "purposed to punish delinquent property owners." JA196-97. 21 WVC seeks to support that holding by arguing West Virginia's tax deed system is only remedial because Wright could have paid the redemption amount, and because "the issuance of the deed after Wright failed to redeem completed the statutory collection process; it was not a separate monetary penalty." 21 WVC Resp. Br. at 48.

As pointed out in Appellant's opening brief, a purely remedial system would not have confiscated from Wright more than the amount legally owed under the tax

lien debt. The state was necessarily fully paid all taxes, interest, fees and charges due it when it sold its tax debt, as secured by a lien on Wright's home, to 21 WVC.[4] Everything that happened after that, including the confiscation of all Wright's title and equity in his home, and the administrative transfer of title and that equity to 21 WVC, was not for the purpose of collecting taxes *due the state*; those taxes were paid in 2021 after the auction of the lien. The purpose was to collect on 21 WVC's behalf the small tax lien 21 WVC purchased by giving it clear title to Mr. Wright's $65,000.00 home. Even if the district court believed the tax deed system of strict foreclosure was not "purposed" as punishment, it cannot be denied that the system does in fact punish delinquent taxpayers; it confiscates land and equity far in excess of the debt owed. The threshold Eighth Amendment question is not the primary purpose a law was intended to serve, but whether its application only compensates or indemnifies the government, or whether in practice the law must also serve *at least in part* a retributive or deterrent goal. *See United States v. Bajakajian*, 524 U.S. 321 (1998); *Austin v. United States*, 509 U.S. 602 (1993); *see also Tyler*, 598 U.S. at 648-50 (Gorsuch, J. concurring); *Grady*, 786 F. Supp. 3d at 996 ("Based on the intent

[4] As applicable to the sale of the lien on Wright's home by the Mercer County Sheriff in November 2021, *see* W. Va. Code § 11A-3-5(a) ("no tax lien for such unredeemed tract or lot or undivided interest therein shall be sold upon any bid or for any sum less than the total amount of taxes, interest and charges then due") (repealed 2022).

and purpose of the tax lien system, combined with its carrot-and-stick nature as outlined in *Folse*, it is clear that the system is at least partially punitive.").

West Virginia's confiscation by tax deed of an entire tax delinquent property when the tax debt owed is far less than that property's value is a civil sanction for non-payment that "can only be explained as serving in part to punish" and is therefore subject to the Eighth Amendment. *See Korangy v. FDA*, 498 F.3d 272, 277 (4th Cir. 2007) (citing *Austin*, 509 U.S. at 610). The district court wrongly held that Wright's complaint failed to state a claim for relief under the Excessive Fines Clause. This Court should reverse that dismissal and remand Count II to the district court for discovery and trial.

## D. The District Court's Dismissal of Wright's Fifth Amendment and Eighth Amendment Claims May Not Be Upheld on 21 WVC's Argument that It Was Not a State Actor.

### 1. The district court found 21 WVC conceded that it was a state actor.

21 WVC argues for the first time before this Court that it cannot be a "state actor" subject to suit under § 1983. 21 WVC did move to dismiss the complaint on the basis that it was not subject to suit as a state actor under 42 U.S.C. § 1983. The district court held "[i]t appears 21 WVC concedes that there is a sufficient ground under controlling precedent to establish that any actions by it were made under color

of law." JA191 n.2. 21 WVC did not cross appeal the finding that it had conceded that issue. 21 WVC did not preserve its right to appeal the district court's finding.[5]

**2. The complaint sufficiently alleges 21 WVC was state actor.**

If the state actor issue had not been conceded, 21 WVC's new argument would still be without merit. The complaint alleged that the state and 21 WVC were joint tortfeasors acting in concert under state law to deprive Wright of his rights under the Fifth and Eighth Amendments. *See* JA001-4. At the motion to dismiss stage, these allegations must be taken as true.

21 WVC argues even if accepted as true, there is no legal basis to conclude 21 WVC's participation with the Auditor made it a state actor. 21 WVC's position is inconsistent with this Court's precedent. In *Plemons v. Gale*, this Court specifically considered the interplay between the same West Virginia tax deed procedures and the Supreme Court precedent defining when private parties become state actors:

> Under West Virginia's statutory scheme, the State is the initial seller of the tax lien; thereafter, the State provides the tax lien purchaser with the mechanism to provide notice to interested parties. The State also extinguishes the owner's rights to the property by issuing the tax deed to the property. In order to accomplish a tax sale, then, private parties must "make use of state procedures with the overt, significant assistance of state officials," and, thus, there is state action.

[5] 21 WVC likewise does not contend that the district court's finding was plain error.

396 F.3d 569, 572 n.3 (4th Cir. 2005). *Plemons v. Gale* is controlling Fourth Circuit precedent: a private party who works together with the West Virginia Auditor to seek and obtain a tax deed for a property on which the private party holds a tax lien is a state actor. The state actor analysis in *Plemons v. Gale* is fully consistent with the Supreme Court's standards for determining whether private parties are state actors pursuant to the Fourteenth Amendment. As *Plemons* noted, when private parties make use of state procedures with the overt, significant assistance of state officials, there is state action. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991); *Tulsa Professional Collection Service v. Pope*, 485 U.S. 478, 486 (1988).

### 3. ***Tunstall v. Office of Judicial Support of Court of Common Pleas*** **is inapplicable and distinguishable.**

21 WVC relies heavily on the easily distinguishable *Tunstall v. Office of Judicial Support of Court of Common Pleas*, 820 F.2d. 631 (3rd Cir. 1987). To begin, *Plemons v. Gale* is the controlling precedent in this Circuit and is directly on point. Moreover, in *Tunstall*, the tax delinquent property was sold at public foreclosure auction and approved by the court. The buyer did not use the foreclosure proceeding to collect a debt owed him; the debt was owed the municipality who conducted the foreclosure. The buyer was nothing more than an auction bidder otherwise unconnected with Tunstall. The Third Circuit found the third-party purchaser at a public foreclosure sale had not acted with the overt assistance of the state. *See Lugar*

*v. Edmondson Oil,* 457 U.S. 922 (1982). Here 21 WVC sought and obtained the Auditor's help in collecting the tax lien Wright owed it after the Mercer County Sheriff tax lien auction in 2021. 21 WVC did so by actively engaging in and pursuing and paying for the separate steps the state required in order to give it a tax deed taking the entirety of Wright's property for payment of a small debt. Therefore, 21 WVC misplaces reliance on *Tunstall*.

**4. 21 WVC shares liability for Wright's injuries as a joint tortfeasor and a member of a civil conspiracy under West Virginia law.**

21 WVC next argues it is not liable for Wright's injuries because Wright's complaint "alleges no facts showing that 21 WVC controlled or manipulated the Sheriff's auction, possessed or directed the disposition of the overplus, decided whether the overplus would be returned, or participated in any refusal to pay it." 21 WVC Resp. Br. at 36. Again, this is a red herring.

Wright claims injury suffered from the Auditor's taking and confiscation of his home on April 1, 2023, in aid of collecting the tax debt then belonging to 21 WVC. JA011-13. While the Auditor's Deputy Commissioner issued the April 1, 2023, tax deed, he did so only because 21 WVC had identified those entitled to receive the demand for payment, had paid for service of the notice, and had requested that deed and paying the Auditor to issue it. *See* W. Va. Code § 11A-3-52(a) & -59. Wright's injury (the loss of his home) was caused by and the product of the joint

actions of the Auditor and the Defendants to collect payment of the tax lien owed 21 WVC by taking Wright's home.

This is the classic model of "joint tortfeasors" under West Virginia law. *See* W. Va. Code § 55-7-13c ("[J]oint liability may be imposed on two or more defendants who consciously conspire and deliberately pursue a common plan or design to commit a tortious act or omission."); Syl. Pt. 14, *Strahin v. Cleavenger*, 603 S.E.2d 197 (W. Va. 2004) ("Tortfeasors whose wrongful acts or omissions, whether committed intentionally or negligently, concur to cause injury are joint tortfeasors who are jointly and severally liable for the damages which result from the wrongs so committed."); *Columbia Gas Transmission LLC v. Tri-State Airport Auth.*, 2016 U.S. Dist. LEXIS 57792, n.12 (S.D.W. Va. 2016). Moreover, West Virginia recognizes the doctrine of civil conspiracy as a legal canon under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission. *See Dunn v. Rockwell*, 689 S.E.2d 255, 268-69 (W. Va. 2009).[6] As a joint tortfeasor and member of a civil conspiracy with the Auditor to accomplish the goal of taking Wright's home by tax deed, 21 WVC is liable for the acts the Auditor took in furtherance of

[6]The doctrine in West Virginia does not require a malicious state of mind, despite what the word "conspiracy" might suggest. *See id.*

the common goal to collect payment of the tax lien Wright owed 21 WVC, even if 21 WVC did not perform all the acts which resulted in Wright's injuries.

The complaint alleged sufficient facts to establish the Auditor and 21 WVC were joint tortfeasors engaged in a civil conspiracy for the collection of a lien owed 21 WVC by taking Wright's home and transferring it to 21 WVC. Accordingly, the District Court's dismissal of the complaint should not be upheld on these alternate grounds.

## REPLY TO RESPONSE OF MARK HUNT

### A. This Court Should Reverse the Lower Court's Dismissal of Wright's Fifth Amendment Claim and Remand for Discovery and Trial.

#### 1. Wright need not seek state remedies before seeking redress pursuant to 42 U.S.C. § 1983 for an unconstitutional taking without just compensation.

Defendant-Appellee State Auditor Mark Hunt ("Hunt") leads with the curious argument that Mr. Wright's Fifth Amendment claim is barred because Mr. Wright could have filed an action in state court to set aside the April 1, 2023, deed issued by the former Commissioner of Delinquent Lands, G. Russell Rollyson. Hunt Resp. Br. 8-9. Without any citation to any case, Hunt declares that there is no taking if there is a statutory process available to set aside the tax deed. Setting aside the absurd notion that Hunt appears to concede that the tax deed was improperly granted but has done

nothing to rescind the deed, Hunt Resp. Br. at 9 ("However, because a redemption occurred by payment of past taxes, the lien was extinguished and the sale is void."), there is no requirement that Mr. Wright first extinguish state remedies prior to bringing his claim for a violation of the Fifth Amendment pursuant to 42 U.S.C. § 1983.

A Fifth Amendment taking requires payment of just compensation even if (perhaps, *especially* if) the taking was wrong. Hunt cites no precedents barring a claim for just compensation where the state wrongly took real property but has not returned it to its owner, nor paid its value. Once Wright lost possession of his home to 21 WVC, LLC, his choice to seek just compensation to remedy his loss, rather than an uncertain and likely contentious suit to find the tax deed void, was a reasonable one. In any case, had he taken that route and obtained the return of his home, he would have still had to pursue Fifth and Eighth Amendment claims against Defendant-Appellees for the damages suffered in the interim after the wrongful issuance of the tax deed.

In any event, a person deprived of their property without just compensation may sue under 42 U.S.C. § 1983 without first pursuing any state law remedies. *Knick v. Twp. of Scott*, 588 U.S. 180, 206 (2019) (overruling the state litigation requirement for Fifth Amendment claims in federal court). Hunt's argument lacks merit.

### 2. Neither W. Va. Code § 11A-3-10 nor § 11A-3-32 provided Wright with the right to claim surplus funds.

Hunt's second argument is equally as puzzling as his first. Hunt claims W. Va. Code § 11A-3-10 and § 11A-3-32 provided Wright with the ability to request the surplus from the tax lien auction; therefore, the district court's clearly erroneous citation to W. Va. Code § 11A-3-65 was harmless error. Hunt Resp. Br. 9-11. But a cursory review of these statutes, reprinted in relevant part in Hunt's Brief, reveals that these statutes do not provide any remedy for a former owner. Rather, they apply to purchasers of tax liens (like 21 WVC) when the property is redeemed. *Compare* W. Va. Code § 11A-3-65 ("Rights of former owner to surplus proceeds;" applying to auction sales conducted by the Auditor) *with* W. Va. Code § 11A-3-10(a)(1) (requiring the Sheriff to distribute the surplus amount *to the tax debt purchaser* "[i]n any case where the property was redeemed"); *and* W. Va. Code § 11A-3-32(a)(2) (referring surplus funds pursuant to W. Va. Code § 11A-3-10). These statutes made no provision for any distribution to the delinquent taxpayer whether or not the tax debt and attendant lien were redeemed. *See Grady*, 786 F. Supp. 3rd at 992 ("Here, the applicable surplus statute is § 11A-3-10 (1995), which does not actually give the former owner a right to the surplus proceeds . . . ."). Prior to the repeal of these statutes, West Virginia's statutory scheme provided no ability for a prior owner like Wright whose property was taken to enforce a tax debt and attendant lien sold by a county sheriff to recover even the surplus funds from the sale of the tax lien.

### 3. The district court never considered the proper measure for just compensation because it erroneously concluded no taking occurred.

Hunt next argues that assuming a taking occurred, the proper measure for just compensation, post-*Pung*, is the surplus – $2,540.11 – from the auction sale of the tax lien. Hunt Br. at 13. Wright briefed the impact of *Pung* earlier in this Reply, and those points of law are specifically incorporated here as they relate to Hunt. By way of further reply to Hunt, the Auditor's Response further emphasizes why this case should be remanded to the district court.

The district court erroneously concluded that no taking occurred because Wright had access to surplus funds through W. Va. Code § 11A-3-65. Hunt now concedes that the district court was incorrect. After misrepresenting state remedies available to Wright, Hunt now wants this Court to rule, on an incomplete record, that the surplus funds tendered by 21 WVC during the appeal are the proper measure of damages – going so far as to suggest that the district court concluded those surplus funds (amounting to $2,540.11) were the proper measure of just compensation for Wright. Hunt Resp. Br. at 12 ("The District Court applied the appropriate compensation standard when it determined that the law provides a right to the actual surplus rather than "fair market value" as "fair market value" is highly speculative and subjective."). As argued earlier in Wright's Reply to 21 WVC, there was never a foreclosure sale fairly conducted consistent with historical standards. Accordingly,

*Pung* does not provide guidance as to the proper measure for compensation in this case. In any event, because the district court concluded no taking occurred, contrary to the decisions of *Pung* and *Tyler v. Hennepin Cty*, this Court need not reach the measure of just compensation and should remand for further factual and legal development.

Hunt contends "the Takings Clause does not require compensation for speculative fair market value that might be recovered but only compensation equal to what the government took above and beyond the taxes." Hunt Resp. Br. at 15. Under *Pung*, that is true **if** delinquent property is sold at a public foreclosure auction sale of title "fairly conducted in light of our country's history of tax sales." Quoting language from *Pung*, Hunt argues that "fair market value" is too speculative a standard for just compensation. But the *Pung* Court's discussion to that effect was in the context of explaining why it would be difficult and burdensome to require former owners be paid fair market value when tax delinquent properties were sold using "traditional tax sale procedures." As Justice Thomas explained in his concurrence, fair market value is the standard measure for Fifth Amendment takings in virtually all other contexts and would be no more difficult to determine for a tax taking than for any other taking. *Pung*, 146 S. Ct. at 1976-79 (Thomas, J. concurring). Indeed, the standard for just compensation for a taking under West Virginia law is fair market value. *See W. Va. Const*. art. III § 9; *W. Va. DOT, Div. of*

*Highway v. W. Pocahontas Props., Ltd. P'ship*, 777 S.E.2d 619, 630 (W. Va. 2015) ("The measure of just compensation to be awarded to one whose interest in real estate is taken for a public use in a condemnation proceeding is the fair market value of the property at the time of the taking."). If Hunt is to suggest that Wright needs to pursue his claims in state court, Hunt should likewise be held to the standards of West Virginia law.

The result is clear: this Court should reverse the district court's conclusion that that no taking occurred and remand with instructions for further factual and legal development as to the proper measure of just compensation.

**B. This Court Should Reverse the Lower Court's Dismissal of Wright's Eighth Amendment Claim and Remand It for Discovery and Trial.**

Wright extensively briefed the impact of *Pung* on his Eight Amendment claim, and consequently, specifically incorporates those argument and points of law here. By way of further reply, Wright addresses the points unique to Hunt's Response in turn. Hunt claims that the Eighth Amendment prohibition against Excessive Fines applies only to forfeitures arising from criminal activities. That has not been the law since at least 1993:

> The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law. It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties. Thus, the question is not, as the

> United States would have it, whether forfeiture under §§ 881(a)(4) and (a)(7) is civil or criminal, but rather whether it is punishment.

*Austin v. United States*, 509 U.S. 602, 609-10 (1993) (citations and quotations omitted); *accord Korangy*, 498 F.3d at 277 ("Civil fines serving remedial purposes do not fall within the reach of the Eighth Amendment. . . But where "a civil sanction 'can only be explained as serving in part to punish,' then the fine is subject to the Eighth Amendment.") (quoting *Austin*, 509 U.S. 610); *Grady*, 786 F. Supp. 3rd at 996 ("[T]he purpose of the Clause is to limit the government's ability to excessively punish a private party through financial means.").

Hunt further argues the West Virginia tax deed process is non-punitive and remedial:

> The legislative intent and purpose of W. Va. Code §11A-3-1 is to ensure regular tax revenue for counties and more particularly our county school systems; not to punish property owners as Appellant inaccurately asserts.

Hunt Resp. Br. at 19. Hunt conveniently omits the description by West Virginia courts of loss of title to property as an intended punitive effect:

> West Virginia's tax lien system serves as a carrot-and-stick to encourage the important public policy of speedy and efficient payment and collection of property taxes. W. Va. Code Ann. § 11A-3-1. The stick in this statutory scheme is aimed at tax-delinquent property owners, and the carrot is the opportunity for a purchaser to acquire property cheaply by purchasing the tax lien and paying the taxes.

*Folse*, 895 S.E.2d at 248; *see also Grady*, 786 F. Supp. 3d at 996. In the typical carrot-and-stick metaphor, the carrot and stick are offered as alternatives to the same

person. But under West Virginia's property tax enforcement system, the property owners receive only the stick; the tax lien purchasers conversely receive only carrots.

Nevertheless, it is the effect a statute has upon an individual which determines whether one has been subjected to an excessive fine, not whether the state set out purposely to punish.

> [The] primary-purpose test finds no support in our law. Because "sanctions frequently serve more than one purpose," this Court has said that the Excessive Fines Clause applies to any statutory scheme that "serv[es] in part to punish. . .
>
> So long as the law "cannot fairly be said solely to serve a remedial purpose," the Excessive Fines Clause applies. Nor, this Court has held, is it appropriate to label sanctions as "remedial" when (as here) they bear "'no correlation to any damages sustained by society or to the cost of enforcing the law,'" and "any relationship between the Government's actual costs and the amount of the sanction is merely coincidental." . . .
>
> [T]his Court has said a statutory scheme may still be punitive where it serves another "goal of punishment," such as "[d]eterrence."

*Tyler*, 598 U.S. at 647-48 (Gorsuch, J. concurring). Purely remedial systems would not have confiscated from Wright more than the tax debt owed. The April 1, 2023, confiscation of all title and equity in Wright's home by tax deed for its transfer to 21 WVC was not for the purpose of collecting taxes owed the state; those were all paid when the tax debt was sold.

The lower court wrongly held that Wright's complaint failed to state a claim for relief under the Excessive Fines Clause in Count II. The entire procedure after the state sells its tax debt is not remedial for the state's interest; the state collects its

due from the proceeds of the auction of the tax lien. The strict foreclosure transfer to the tax lien holder represents the state's confiscatory act to deter non-payment – the stick – and aids the tax lien holder in collection of a civil debt now owed it – the carrot. This Court should reverse that dismissal and remand Count II for discovery and trial.

### C. There is a Factual Dispute Whether Hunt is Entitled to Sovereign Immunity.

As noted earlier, the U.S. Supreme Court has recognized that takings claims may be brought in federal court notwithstanding available state remedies. *See Knick*, 588 U.S. at 206. An exception to *Knick* exists where the taking is committed by a state officer or agency and state courts are open to adjudicate such claims. *See Hutto v. South Carolina Ret. Sys*., 773 F.3d 536, 552 (4th Cir. 2014); *Zito v. N.C. Coastal Res. Comm'n*, 8 F.4th 281, 286 (4th Cir. 2021). While one of those exceptions certainly applies – Hunt is a state official – there is a serious question whether the state courts are open to adjudicating Wright's constitutional claims.

Hunt asserts West Virginia circuit courts have jurisdiction over Wright's federal Constitutional claims against the state:

> West Virginia courts are authorized to adjudicate Appellant's claims as the West Virginia Constitution confers on its circuit courts broad original and general jurisdiction. *See* W. Va. Const. Art. VIII, § 6. The West Virginia Constitution also provides that takings claims may be brought in those courts. *See* W. Va. Const. Art. III, § 9. Additionally, W. Va. Code §11A-4-2 provided Appellant with an adequate remedy to set

> aside the tax deed and recover his home by petition to circuit court, which would nullify any takings clause issue and allow him to recover the full home equity.

Hunt Resp. Br. at 30. Wright already addressed the red herring W. Va. Code § 11A-4-2 argument earlier. The remaining question of whether West Virginia courts are open to Wright's Fifth and Eighth Amendment claims remains very much in doubt, despite Hunt's representations.

To begin, the Supreme Court of Appeals of West Virginia has expressly held that the West Virginia Constitution prohibits suits against a state agency for failure to pay just compensation. *See* Syl. Pt. 3, *W. Va. Lottery v. A-1 Amusement, Inc.*, 807 S.E.2d 760, 762 (W. Va. 2017). In that case, the state high court suggested the only remedy was a mandamus against the taking agency in circuit court to compel eminent domain proceedings. While arguing to this Court that West Virginia courts are open to Wright's taking claim, Hunt takes the opposite position in a current state court inverse condemnation action as to real property taken by administrative issuance of a tax deed without payment of just compensation. In that case, Hunt is telling the state court that no remedy is available.[7] All agree that there is a state remedy for inverse condemnation when a West Virginia state agency fails to

---

[7] *See* Memoranda of Law filed by Hunt in 2026 in *Sharon Flack v. Mark Hunt*, Kanawha County Circuit Court Case No. 2026-C-8 to support his motion to dismiss mandamus action to compel filing of inverse condemnation action for failure to state a claim. Supp. App'x 0001-30.

commence eminent domain proceedings after a taking. But in a case like Wright's, Hunt maintains that there is no taking notwithstanding the clear decisions of *Tyler*, *Pung* and *Grady*. Indeed, the very case upon which Hunt relies for his sovereign immunity argument, *Flack v. Hunt*, is the case where he is taking an inconsistent position on the availability of state court remedies for taking claims to his position in this case.

Hunt's new sovereign immunity argument is a carefully laid trap for West Virginia property owners, such as Flack and Wright, who lost their homes by administrative tax deed. Hunt represents to federal courts that there are state remedies available, but when a case is filed in state court, Hunt denies that there is relief available. The fact that Hunt flips back and forth on the availability of a state remedy depending on the forum he is in and the way he wants that court to rule, shows there is a factual question as to whether the courts of West Virginia are or are not open to claims such as those made by Wright. *Cf. DeVilliers v. Texas*, 601 U.S. 285, 292 (2024) (observing there is an open question whether state may be sued directly in federal court under the Fifth Amendment if it is conceded no state remedy exists). Notably, the court in *Flack* made no finding that the state courts provide a remedy for Flack. *See Flack v. Hunt*, No. 2:25-cv-00253, 2025 U.S. Dist. LEXIS 203373, at *10 (S.D.W. Va. Oct. 15, 2025). Additionally, given West Virginia's constitutional immunity from suit in state court, it is not at all clear whether state

courts would provide the opportunity for Wright to recover his full measure of damages arising from his Fifth Amendment claim. *Cf. DeVilliers*, 601 U.S. at 293 (Texas represented that DeVilliers had a cause of action under Texas law); *Zito*, 8 F.4th at 290 ("As explained above, North Carolina's procedures are consistent with *Knick*; North Carolina's procedures guarantee the ability to challenge the Commission's action as a taking in state court; and if North Carolina's statutes do not provide an adequate constitutional remedy, the North Carolina Constitution guarantees the Zitos the ability to seek that remedy in state court."). Hunt points to no state court remedy for Wright's Eighth Amendment claim.

Finally, were this Court to determine that indeed a state remedy exists, it would arguably run afoul of sovereign immunity by allowing Wright to secure a declaratory judgment from federal court – *i.e.*, a declaration that state courts are available for Wright's taking claim – to be used to obtain retroactive relief from the state. *See Albert v. Lierman*, 152 F.4th 554, 561 (4th Cir. 2025) (declaratory relief that has the effect of providing retroactive damages from the state is violative of sovereign immunity); *see also Green v. Mansour*, 474 U.S. 64, 72-73 (1985) ("[I]f the federal judgment were res judicata in subsequent state proceedings, then the federal court will have lifted the case out of the state court before the state agency or court can hear it . . . ."); *Flack*, 2025 U.S. Dist. LEXIS 203373, at *10 n.3.

Hunt concedes the immunity issue was not raised below, and the bare record of Wright's complaint is not a sufficient basis to decide that issue. Notwithstanding the cursory unpublished opinion in *Flack*, the questions (1) whether a tax deed issued by Hunt or his predecessor is a taking under West Virginia law, and (2) whether the state courts provide an ability for Wright to obtain full relief for his federal claims are uncertain. Accordingly, Wright requests that the Court abstain from ruling on the immunity issue, remand and require the lower court to develop a record as to whether Wright can assert a remedy against Hunt in state court.

## CONCLUSION AND REQUEST FOR RELIEF

For all the reasons argued above and in his opening brief, Plaintiff-Appellant Anthony Wright asks this Court to reverse the district court's dismissal of this Fifth Amendment and Eighth Amendment claims. He asks this Court to enter judgment holding his complaint states valid claims for relief under the Fifth and Eighth Amendments, and that the case be remanded then to the District Court for further proceedings in accord with that mandate.

/s/ Gary M. Smith
Bren J. Pomponio (WVSB # 7774)
Gary M. Smith (WVSB # 12602)
MOUNTAIN STATE JUSTICE, INC.
1217 Quarrier Street
Charleston, WV 25301
Office: (304) 344-3144
Fax: (304) 344-3145
Email: bren@msjlaw.org
Email: gary@msjlaw.org
*Counsel for Plaintiff-Appellant*